UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

UNITED STATES OF AMERICA,                    :

               v.                    :

JOSEPH FREEMAN,                    :

              Defendant.                    :
--------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 8, 2011

11 Cr. 567 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge

Defendant Joseph Freeman ("Freeman") moves to suppress the firearm seized from him by the New York City Police ("Police"), at the intersection of Young Avenue and East Gun Hill Road in the Bronx, at 1:40 a.m. on April 27, 2011, after wrestling with two plain clothes police officers. Freeman argues that his Fourth Amendment rights were violated when he was stopped without reasonable suspicion. The Court held a suppression hearing on October 25, 2011. For the reasons that follow, Freeman's motion to suppress the firearm is DENIED.

## SUMMARY OF THE FACTS[1]

At approximately 1:40 a.m. on April 27, 2011, the Police's radio dispatch issued a "gun run" for 1308 East Gun Hill Road, between Burke Avenue and Young Avenue, involving a male Hispanic, "wearing a black hat and white t-shirt," who was standing in front of a Chase Bank, "arguing with a female." (GX 24.)[2] Seconds later, the dispatcher reported that the caller had called back and reported that the male was now "walking towards Burke" Avenue, and was

---

[1] The facts are taken from Police Officers Walsh and Morales's testimony at the October 25, 2011 Suppression Hearing and exhibits admitted during this hearing, together with Mr. Freeman's Declaration of August 17, 2011.

[2] The radio dispatch calls were based on several anonymous phone calls to the 911 operator. A CD recording of the 911 calls and the resulting radio dispatches are attached to Freeman's motion papers as Exhibit D. The printed "sprint" reports of the 911 calls and the radio dispatch are attached to Freeman's motion papers as Exhibit E.

wearing "a long white t-shirt." (Id.) Twenty seconds later, the dispatch reported that the "male is a male black, he's wearing a white du-rag, with a black hat, long white t-shirt and he's standing on the corner of Burke." (Id.) After seven seconds, the dispatcher says that the caller, a female, now reports that he was "heading back towards Chase Bank," located at 1308 East Gun Hill Road. (Id.) An officer from the 49 Precinct's anticrime unit asked the dispatcher to confirm with the caller whether she actually saw a gun; but the dispatcher was unable to confirm this. (See id.; see also Oct. 25, 2011 Hearing Tr. ("Tr.") 11:20-21, 56:11-13.)

Police Officers Walsh and Conroy heard the "gun run" radio dispatch. They were on duty, in plain clothes and in an unmarked police vehicle, surveilling a school building located at Schorr, Woodhull and Arnow, just off of East Gun Hill Road. (Tr. 5:5-22.) The school was subject to a pattern of burglaries. (Id.) Their location was approximately 7-8 blocks from the intersection of East Gun Hill Road and Burke Avenue. (Id. 10:16-21.)

Officer Walsh explained that a "gun run" indicates that "a person is possibly armed with a firearm." (Id. 6:4-6.) Immediately upon hearing the first dispatch, the officers left the school site and drove directly to the scene. Officer Walsh wanted to get to the scene as fast as he could because "there is someone possibly armed with a firearm. . ." (Id. 8:20-25.) They drove north on Woodhull, turned left onto East Gun Hill Road, and proceeded to Burke Avenue, arriving in less than a minute. (Id. 10:16-21.)

Officer Walsh testified that when they arrived at Burke Avenue, he saw a male (Freeman) wearing a black hat and a white t-shirt. (Id. 10:22-25.) Officer Walsh kept his eye on Freeman while the officers canvassed the area along East Gun Hill Road for any other individuals who might match the first radio dispatch description. (Id. 12:1-12, 23-24.) None did. (Id. 13:6-8.) Freeman matched the description given in the second dispatch, which Officer Walsh testified he

heard as he arrived on the scene: male black, wearing a long white t-shirt, a black hat, and a white du-rag, and who was walking east on East Gun Hill Road, with Burke Avenue to his back and Young Avenue in front of him, just as the radio dispatch described ("standing on corner of Burke . . . . now . . . heading back towards Chase Bank. . .")(GX 24).

Officers Walsh and Conroy made a u-turn so that they would be proceeding east on the south side of East Gun Hill Road, parallel and adjacent to Freeman.  (Tr. 12:6-22.)  They parked their vehicle at the corner of Young Avenue and East Gun Hill Road.  (Id. 16:1-5.)  Officer Walsh testified that he observed Freeman walking in an "aggressive manner.  He was walking in a straight line.  His fists were clenched.  He wasn't paying attention to what was around him, looking to his left or right or anything.  He was by himself."  (Id. 14:11-16.)

Officer Walsh testified that East Gun Hill Road is a high crime area,[3] where robberies and burglaries occur (e.g., Officer Walsh was on a burglary surveillance seven blocks away from Young Avenue and Burke Avenue).  (Id. 11:10, 36:23.)  He testified that "[w]e had somebody shot on the corner of Burke Avenue and East Gun Hill Road . . . [w]e have had shots fired jobs."  (Id. 11:10-13.)  Officer Walsh was also familiar with the bar on the corner of Young Avenue and East Gun Hill Road, where the incident occurred.  "There is usually a lot of [loud(?)] people, people hanging outside the bar . . . . They cause a public disturbance, they're loud, they're intoxicated."  (Id. 45:14-18.)

In addition to these external indicia concerning the location, Walsh knew, based on his training and experience, that baggy clothes and longer shirts are used to conceal weapons.  (Id.

---

[3]  There was testimony that uniformed officers patrolled in low crime areas, and that plain clothes officers were prevalent in high crime areas.  (Tr. 38:11-16.)  As to whether East Gun Hill Road is a high crime area, it is significant that all of the first responders (Officers Conroy, Walsh and Morales) were in plain clothes.  (Id. 5:5-9, 52:5-8.)  Further the police officers voice on the radio dispatch was Officer Monroe, who was with the 49 Precinct's anticrime team.  (Id. 11:20-21, 56:11-13.)  Indeed the radio dispatch was directed to anticrime personnel.

14:20-15:1.)  Officer Walsh believed that Freeman's long t-shirt (see GX 23) could be concealing a firearm in Freeman's waistband.  (Tr. 15:24-25.)

As Officer Walsh pulled the car to the curb, ahead of Freeman, they "watch[ed] him in the side-view mirrors, [and] wait[ed] for him to approach up to the car."  (Id. 16:7-9.)  At that point, Officer Conroy got out of the car.  Officer Walsh testified that Officer Conroy identified himself as a Police Officer.  (Id. 16:11.)  Officer Conroy's shield was out and displayed on his chest.  (Id. 16:14-17.) Officer Conroy addressed Freeman "hey buddy, can I talk to you for a second" and tried to touch Freeman's right arm.  (Id. 16:11-13.)  Freeman did not stop; instead, he kept walking.  (Id. 16:21-23.)

Officer Walsh then got out of the car to try to stop Freeman.  His shield was out and displayed on his chest.  (Id. 17:8-11.)  Officer Walsh "tried to like grab his arm, get him to turn around, but he just ripped away from me again.  That's when I just grabbed him by the waist and tried to physically stop him."  (Id. 17:2-7.)  The struggle continued as the parties wrestled with one another across Young Avenue.  (Id. 17:21-18:1.)  Officer Walsh got Freeman to the ground by tripping him.  (Id. 18:4-5.)  As they struggled, Freeman kept moving his hands towards his waist, and even when he was on the ground, Freeman kept on "shoving his hands underneath his waist."  (Id. 18:10.)  Officers Walsh and Conroy kept on trying to rip his hands out.  (Id. 18:10-11.) Freeman's affidavit describes the same encounter as follows:  "I tried to pull away from them, but the men grabbed me, shoved me to the ground and pinned me there.  This all happened very fast."  (Freeman Declaration August 17, 2011, ¶ 7.)

By this point, other officers, including Officer Morales, of the Bronx Borough Anticrime Unit,[4] had arrived on the scene.  (Tr. 18:18-24.)  Freeman continued to struggle and shove his hands underneath his waist.  (Id. 53:21-24.)  While trying to pry Freeman's hands out from under

---

[4]  The Bronx Borough Anticrime Unit is a unit that targets high crime areas.  (Tr. 50:23-25.)

him, Officer Morales felt a metal object in front of Freeman's stomach, which he believed to be a firearm.  (Id. 53:25-54:2)  The officers eventually handcuffed Freeman.  (Id. 19:1-2.)  Officer Morales frisked Freeman, and found a loaded firearm in Freeman's waistband.  (Id. 19:1-3, 54:10-14.)

## PROCEDURAL HISTORY

On May 20, 2011, the Government filed a complaint charging Freeman with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  On June 13, 2011, Freeman voluntarily surrendered and on July 5, 2011, a grand jury indicted Freeman.  On August 17, 2011, Freeman moved to suppress the physical evidence of his possession of a firearm. Freeman does not argue that he did not have the firearm, or that the firearm was not his, but rather that the Police stopped Freeman without reasonable suspicion in violation of his Fourth Amendment rights.  This Court held a suppression hearing on October 25, 2011.  Officers Walsh and Morales testified; Freeman offered no testimony other than his declaration in support of the motion to suppress.

## DISCUSSION

An officer is allowed to conduct an investigatory stop based upon "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989).)  Reasonable suspicion is an objective test, looking "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."  United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotations omitted).  Reasonable suspicion is a lenient standard that requires "considerably less" than a preponderance of the evidence.  Tehrani, 49 F.3d at 58.

An officer's "reasonable suspicion must arise before a search or seizure is actually effected." United States v. Swindle, 407 F.3d 562, 568 (2d Cir.2005).  A seizure occurs when "(1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained." United States v. Simmons, 560 F.3d 98, 105 (2d Cir. 2009).  "'[T]he grounds for a stop may . . . be based on events that occur after the order to stop is given,'" such as where the suspect attempts to flee from police after being ordered to stop. Id. at 106 (quoting Swindle, 407 F.3d at 568).

Freeman argues that the firearm should be suppressed because the Police Officers did not have reasonable suspicion to stop and frisk Freeman.  Freeman relies, in large part, on the Supreme Court's ruling in Florida v. J.L., 529 U.S. 266 (2000).

In J.L., the Supreme Court considered whether an anonymous tip that a young black male, standing at a particular bus stop, wearing a plaid shirt, and "carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person." Id. at 268.  In that case, when the police responded, they encountered three black males at the bus stop, one of whom (J.L.) was wearing a plaid shirt. Id.  The police did not see a firearm and J.L. made "no threatening or otherwise unusual movements." Id.  The officers stopped and frisked J.L., and discovered a gun. Id.  The Court held that "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." was not sufficient to provide reasonable suspicion for the police officers' investigatory stop and frisk of J.L. Id. at 271.

The call in question in J.L. came from "an unknown location by an unknown caller." Id. at 270.  The Court focused on the reliability—or really the lack of reliability—of an anonymous tip: "If the telephone call is truly anonymous, the informant has not placed his credibility at risk

6

and can lie with impunity.  The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable."  Id. at 275 (Kennedy, J., concurring).

The majority recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'"  Id. at 270 (quoting Alabama v. White, 496 U.S. 325, 327 (1990)).  The Court noted that the record did not show whether some notation or other documentation of the call was made either by voice recording or tracing the call to a telephone number.  Id.  Justice Kennedy, in his concurring opinion, stated that "[v]oice recording of telephone tips might, in appropriate cases, be used by police to locate the caller.  It is unlawful to make false reports to police . . . and the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips."  Id. at 276 (Kennedy, J., concurring) (citing Fla. Stat. Ann § 365.171(16) (Supp. 2000); Fla. Stat. § 817.49 (1994)).  These factors might create sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop.  See id.  Here of course, we have recordings of the anonymous 911 calls.  (Baumgartel Declaration August 17, 2011, Ex. D.)[5]  Additionally, we have "printouts detailing the . . . dispatches to police," which include both the number (ANI) and the location (ALI) of the caller.[6]  (Id. Baumgartel Decl. ¶8, Ex E.)  The caller here was on a cell phone, not a land line, and the records show the location of the cell site used by the caller.  The location was Seymour Avenue, a block away from the scene.

---

[5]  Ms. Baumgartel's declaration was submitted in support of Freeman's motion to suppress and included a recording of the 911 calls (Ex. D.), the radio dispatch and "printouts detailing the . . . details of the dispatches to police" (Ex. E.).

[6]  ANI stands for Automatic Number Identification, which corresponds to the telephone subscriber's seven digit telephone number.  ALI stands for Automatic Location Identification, which provides an address display of the subscriber calling 911.   See generally, Civic Ass'n of Deaf of New York City, Inc. v. City of New York, No. 95 Civ. 8591, 2011 WL 3586133, at *2 (S.D.N.Y. Aug. 12, 2011) (describing "ANI/ALI database" as a database that identifies the number of the caller making the 911 call and the address associated with that number).

(Id. Ex. E, at 3.)  Further, under New York law, it is unlawful to make a false report to the police or a 911 operator.  See N.Y. Penal § 240.50.

In J.L., the Supreme Court also noted that "[s]ometime after the police received the tip— the record does not say how long—two officers were instructed to respond. They arrived at the bus stop about six minutes later . . ."  Id. 268.  Here the contemporaneously prepared records show that the calls to 911 and the radio dispatches were back to back, with the "gun run" dispatch immediately following the first call to 911.  (See Baumgartel Decl., Exs. D, E.)  The anticrime units immediately responded and the first officers arrived on site in less than a minute. In fact, they were on the scene when they heard the second dispatch, which further described Freeman's appearance and noted the direction in which he was walking (east on East Gun Hill Road heading towards Young Avenue where the bar was located).  Unlike J.L. who made "no threatening or otherwise unusual movements," 529 U.S. at 268, Freeman ripped his arms away and wrestled with the police officers.

The facts here are substantially different than those in J.L.  The call was verifiable; the 911 operator was able to return the call; the caller called a second time with updated and corrected information, which the responding police officers could verify because they heard the second dispatch when Freeman was in clear view.  It is also clear that given the accurate information concerning Freeman's movement, the caller must have been an eyewitness in the immediate area.  Indeed, the cell information shows that the cell site was in the immediate vicinity of the incident.  Finally, unlike J.L. where the defendant was one of three, Freeman was the only individual in the area who matched the description given.  When approached, Freeman refused to stop and when he was touched he flailed his arms.

Even if the facts here do not take this case outside of the J.L. prescription, the Second

Circuit has considered what factors, when viewed together with an anonymous tip or 911 call, provide reasonable suspicion to make an investigatory stop.  In United States v. Muhammed, 463 F.3d 115, 123 (2d Cir. 2006), the Second Circuit held that a "detailed description by an anonymous tipster," from which the police could rapidly identify the suspect, located in "a high crime area," and where the police observed the individual's "evasive conduct" upon seeing the police, provided the officers with reasonable suspicion to stop the individual.  The Second Circuit found that the "officers' personal observations of Muhammad's evasive conduct was the additional factor, missing in J.L., that corroborated the anonymous tip and provided the objective manifestation that criminal activity was afoot."  Id.

In United States v. Simmons, 560 F.3d 98 (2d Cir. 2009), the police received a dispatch at 4:25 a.m., based on an anonymous 911 call, reporting an assault in progress with "a possible gun involved," involving a black male, wearing a grey hoody and black jacket at a particular apartment building.  Id. 101.  Within two minutes of this dispatch, two police officers arrived at the specified building.  One of the arriving officers asked a group of people outside the building whether anyone was being "beaten up."  Id.  The group answered "no," and the officers did not see anyone being assaulted or any evidence of an assault.  Id.  The officers then saw three individuals in the lobby of the building including Simmons, a black male who was wearing a gray hooded sweatshirt and a black jacket.  Id.  They did not see a gun.  The officers knew that there was a drug problem and gang presence in the neighborhood, and that shots had been fired in the neighborhood in the past.  Id.  When the police officers entered the building, "Simmons began walking toward them with his hands in his jacket pockets."  Id.  Police ordered Simmons to "'hold on a second' but Simmons continued walking."  Id. The police again ordered Simmons to hold on, and he stopped.  Id.  Police then twice ordered Simmons to remove his hands from his

pockets; but Simmons did not comply.  Id.  The officer then grabbed to Simmons' right side and felt the butt of a gun.  Id.

Simmons distinguishes J.L. on the basis that the "anonymous 911 call in this case . . . reported an assault with a weapon in progress."  Id. 104-105.  The court held that "an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality."  Id. 104-105.  The Circuit reasoned that this "approach recognizes the need for police to act on reports of an emergency situation without delay, but still requires police officers to corroborate allegations of criminal activity in some meaningful way."  Id. at 105 (internal citation omitted).  The Second Circuit noted that "the case is close," and found that the following factors, in addition to the anonymous call, were sufficient to provided reasonable suspicion to support the stop:  (1) the "officers, upon arrival, encountered Simmons along with a gathering of people at the apartment building, late at night, and in a high-crime area"; (2) as the officers entered, "Simmons was walking toward [the officers] with his hands in his pockets," which could have suggested he was concealing a weapon; and (3) "Simmons' non-compliance with the first order to stop," which "when viewed in light of the circumstances, reinforce the officers' determination that he may have been engaged in criminal activity."  Id. 108.

As already indicated, the facts here are quite different from the facts in J.L., and are more closely aligned with the facts in Simmons.  Reviewing all the factors, detailed below, the Court determines that there were sufficient indicia of reliability to provide the Police Officers with reasonable suspicion that Freeman may have been engaged in criminal activity.  To begin with, the physical description provided in an anonymous tip was accurate, as was the report of Freeman's location and movements.  All of this information was recorded, and the response was

so prompt, that that the two arresting officers were on site at the time of the second dispatch.

Even if the radio dispatch did not create reasonable suspicion (and this may well be a case which

falls within the question reserved in <u>J.L.</u>'s majority opinion: where phone tips have sufficient

indicia of reliability), the accuracy and reliability of the tip must be considered as part of the

totality of the circumstances in evaluating whether the officers had a reasonable suspicion to stop

Freeman.  The anonymous caller here called twice, and provided a detailed description of the

individual's color, clothing, location, and direction of movement.  (<u>See</u> GX 24.)  It is readily

apparent that the caller was an eyewitness, as she provides an almost continuous report of the

individual's movements.  (<u>See id.</u>)  As an eyewitness, this "information was credibly available to

[her] and [she] accurately predicted what would follow," namely, that an black male, wearing a

long white t-shirt and a white du-rag, would be walking away from his previous location on

Burke Avenue and east towards Chase Bank on East Gun Hill Road.  <u>See</u> <u>United States v.

Torres</u>, 534 F.3d 207, 211-212 (3d Cir. 2008) (holding that a tip, reported by an eyewitness who

recently viewed the criminal activity, which provided a detailed description based on information

credibly available to the tipster and that accurately predicted what would follow, is

distinguishable from the bare report in <u>Florida v. J.L.</u>).[7]

From the caller's detailed description the police rapidly identified Freeman, who was the

only individual in the area matching the caller's description.  Freeman matched the description

exactly, as he is a black male and was wearing a long white t-shirt (GX 23), a white du-rag, and

a black hat, and he was the only person walking east on East Gun Hill Road towards Chase

---

[7]  The printouts detailing the radio dispatch indicate that the caller's TMobile phone was routed through a cell site on Seymour Avenue (Baumgartel Decl., Ex E at 3), which intersects with East Gun Hill Road and Burke Avenue.  This further demonstrates that the caller was an eye-witness.  Moreover, the information shows that the phone tip was not completely anonymous: the number and approximate location are known, giving the tip a greater indicia of reliability.

Bank.[8]

It is also relevant that this incident occurred late at night, in a high crime area.  See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis.").  Further, the dispatch reported that a man, possibly with a gun, was arguing with a woman.  (GX 24.)  It is difficult to discern the difference between the report of an assault in Simmons (but no observation of an assault or evidence of an assault) from the report here of an armed man arguing with a woman.  This was transmitted by the dispatch as a "gun run," bespeaking a higher degree of danger than the bare report of an individual with a firearm.

Finally, the Court finds Freeman's conduct when approached by Police provides additional corroboration to the tip.  The Court finds credible Officer Walsh's testimony that Officer Conroy identified himself as "Police," as he exited the vehicle; and that he was wearing

---

[8]  Freeman argues that his case is comparable to United States v. Jackson, No. 10 Cr. 783(NRB), 2011 WL 1431983 (S.D.N.Y. Apr. 12, 2011), where the Court suppressed a firearm seized as a result of an anonymous 911 call.  Jackson is distinguishable.  In Jackson, the police issued a radio dispatch, around 2:19 p.m., that a Hispanic, light skinned-male, had a gun at a specific location; that the male was of medium build, with dark brown hair who appeared to be 19 or 20, and was wearing a red hat, a white t-shirt, blue jeans and carrying a black book bag.  Id. at *1.  Upon canvassing the area, the police identified two Hispanic males, both wearing red hats and white shirts, and one of these Hispanic males was entering the building identified by the caller.  Id. 2.  The police did not stop either of these men, but rather, stopped Jackson, a 25 year old African-American male who was wearing a red hat, white t-shirt and blue jeans and who, when approached by the police, "made no effort to leave the scene or run away."  Id. at *2-3.  Additionally, in Jackson, there was a substantial discrepancy in the testimony between three police officers and a supervising officer, who gave a different version of the facts.  Id. at 2-7, 11.  By contrast, here, the dispatch was made late at night, the police stopped the only individual who fit the caller's description—and in this case fit the description exactly—and who when approached by an identified police officer refused to stop and continued to walk, and then resisted reasonable efforts to stop him.

his shield.[9]  The Court also infers from Walsh's testimony about where he parked his vehicle,

that when Officer Conroy got out of the car he was in front of Freeman with his shield in plain

sight.  After Officer Conroy identified himself as "police," he said "Hey buddy can I talk to

you," but Freeman did not stop, instead, he kept walking.  When Officer Conroy touched his

arm, Freeman pulled away and Officer Walsh joined in Officer Conroy's effort to stop Freeman.

Freeman admits that he "tried to pull away from them."  (Freeman Decl. ¶ 7.)  Evasive behavior

is "a pertinent factor in determining reasonable suspicion."  Wardlow, 528 U.S. at 124.

Freeman's conduct could have suggested to Officers Walsh and Conroy that that Freeman may

be carrying a firearm as suggested by the dispatch.  As the Second Circuit recognized in

Simmons, "although '[a]n individual approached by an officer who has no reasonable suspicion

of wrongdoing may ignore the officer and go about his business' without triggering reasonable

suspicion . . . [the individual's] non-compliance with the first order to stop, when viewed in light

of the circumstances, [can] reinforced the officers' determination that he may have been engaged

in criminal activity."  560 F.3d at 108 (quoting United States v. Muhammed, 463 F.3d 115, 123

(2d Cir. 2006)).  The Court finds that all of these circumstances, viewed together, provided the

officers with the reasonable suspicion necessary to stop Freeman.  Freeman was then seized

when the officers physically restrained him.  See id. at 105.

      An officer is permitted to conduct "a reasonable search for weapons" for his protection,

where he has "reason to believe that he is dealing with an armed and dangerous individual,

---

[9]  Officer Walsh is aware of the investigation into ticket fixing by the police in the Bronx.  He understands that ticket fixing involves perjury; where an officer "messe[s] up the testimony" so that the traffic charges are dismissed.  (Tr. 21:17-18, 22:6.)  Walsh distinguishes that kind of testimony, which he characterizes as a "courtesy" to police officers, from testimony involving a crime.  (Id. 22:17, 23:17-19.)  In those situations, he would tell the truth.  (Id. 23:5.)  The oath taken by a witness commits the witness to tell the truth, and does not allow for exception.  Notwithstanding Walsh's willingness to lie about traffic violations, and the Court cannot condone the justification he offers, the Court accepts his testimony that he would not lie in federal court about a serious crime.

regardless of whether he has probable cause to arrest the individual for a crime." Terry v. Ohio, 392 U.S. 1, 27 (1968). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. The officers here had reason to believe that Freeman was armed and dangerous because he matched the description of an individual in a "gun run" dispatch; the 911 calls and the radio dispatches were recorded and documented; it was late at night and he was in a high crime area; he was dressed in a fashion that would conceal a weapon; when approached by police he refused to stop walking; when he was touched he flared his arm and tried to break away; and during the officers' struggle to physically restrain Freeman, Officer Morales felt a metal object in front of Freeman's stomach, which he believed to be a firearm.

## CONCLUSION

The Court finds that Freeman's Fourth Amendment rights were not violated by the Police Officers' stop and frisk of Freeman on April 27, 2011. Freeman's motion to suppress is DENIED.

The Court excludes time between the date of this opinion and a conference scheduled for Tuesday, November 22, 2011, at 2:00 p.m., in Courtroom 20-C, under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A). Allowing the parties time to consider how to proceed in light of this opinion is in the interests of justice, which outweighs the best interests of the public and the defendant in a speedy trial.

Dated:  New York, New York
        November 8, 2011

SO ORDERED

PAUL A. CROTTY
United States District Judge

14